## SOCOLOV v. UNITED STATES.
### No. 13798.

District Court, E. D. New York.
March 23, 1934.

Gazan & Caldwell, of New York City, for libelant.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y., and Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal, of New York City, of counsel), for the United States.

BYERS, District Judge.

In this cause the libelant seeks to recover damages for personal injuries suffered by him, on June 3, 1932, on the steamship Davenport in New Orleans.

He was an extra hand, having a stand-by job for five days prior to the accident, and acted as a replacement for one member of the regular crew.

He received a head injury through being struck by an iron bar 41 inches long, 2 inches wide and ½ an inch thick, with a tapered end which was inserted in a vertical wheel that operated the braking gear of the ship's windlass.

The fact of the injury is not disputed, but the circumstances giving rise to it are the subject of conflicting testimony.

The libel alleges that, while the libelant was in the performance of his duties and acting within the scope of his employment, he was caused to be struck by the said bar, which so injured him as to cause traumatic insanity; that the accident was not due to any negligence on the part of the libelant, but to the negligence of the respondent and to the defective and dangerous condition of the hand-brake of the said windlass and of the iron bar "which was being used by one of the said incompetent's officers; in that said incompetent's fellow servant and superior was careless and negligent in permitting the said iron bar or brake bar to strike the said incompetent," and in that the brake bands and other parts and appurtenances of the windlass were in an insecure, defective, old, worn, broken and out of repair condition; that the respondent failed and neglected to repair and maintain the windlass, its parts, appurtenances, etc.; that the libelant's superior officers and fellow servants were negligent in

that they failed and neglected to warn him of the dangers to be encountered in the performance "of said work"; also failure to provide the libelant with a safe place in which to work, for the reasons stated, and because the deck was covered with grease and débris, and was in a dangerous condition.

The libelant offered no evidence except his own testimony as to how the accident happened, and the deposition of a seaman (Spencer) and that of the doctor in the Marine Hospital in New Orleans, and hospital records of that institution.

There is no evidence that the deck was covered with grease or was otherwise in a dangerous condition or that the mechanism referred to was old, out of repair or otherwise defective.

The only possible question of negligence is presented by the libelant's contention that the first officer permitted the iron bar to strike him.

It is found that the ship, on the morning of June 3, 1932, was at anchor in the Mississippi river at New Orleans, held in position by her port anchor; she was about to proceed under her own power and with the assistance of a tug, to a shipyard a mile or two distant, shortly after daylight; this required that the anchor be heaved, which was conducted by the chief officer, Pitlock, with the assistance of certain seamen, namely, Hopper, the boatswain, and Spencer, an able-bodied seaman; Berger, the libelant, was standing by subject to orders. They were all on the forecastle head when the anchor was heaved.

When that had been accomplished, the anchor was held in place, ready to be dropped instantly if the occasion required, because navigation at that place was dangerous and it might be necessary to let go the anchor at any instant. To accomplish this, the windlass was unlocked by the chief officer, i. e., he tightened the compressor band and threw out the gear, which is a part of the hoisting apparatus. The brake, when functioning, holds the anchor in the position to which it has been raised; the braking gear is operated from a hand wheel through a worm on the braking gear of the windlass; when that is tightened, it compresses the brake band and thereby holds the windlass in place. The hand wheel is operated first by hand and then the bar above referred to is inserted in one of a number of slots in the circumference of the wheel in the top arc, and pulled down to a horizontal position. This is the usual type of braking gear, and the disputed question is whether the libelant, who was injured because of what happened while he was manipulating or attempting to manipulate the bar, acted on his own responsibility in attempting to use it and was clumsy or awkward in so doing, whereby the bar slipped out of the receptacle in the slot in which it was engaged at its tapered end; or whether he assisted the chief officer who took or grasped the bar and was pushing it toward the libelant, and did this in such a faulty manner that the bar slipped out of the wheel and struck the libelant the blow which caused the injury.

The chief officer, Pitlock, and the two other seamen testified under deposition, and no one of the three says that he saw the accident. The mate says that he tightened the bands and threw out the gear (hoisting) and then walked forward to the eyes of the ship, in accordance with his duties; that he gave no orders to any one to tighten the compressor, and that his attention was drawn to the libelant by hearing a noise, when he looked around and saw the libelant with his hand on his forehead, which was bleeding; that he motioned to the bridge to indicate that an accident had happened, and the Captain, who was on duty, immediately sent the third officer to the place in question, and the latter took the libelant aft, where, in the course of ten minutes, he received attention.

The mate deposed that he asked the libelant how the accident happened and the reply was: "It is no one's fault but my own" —that "he thought he would tighten up a little more on the bar," and the mate said: "Who told you to?" to which there was no answer.

Spencer, who was a witness for the libelant, said that he was on the forecastle head on the port side, coiling a heavy rope to which was attached a heaving line which would be used as soon as the ship arrived at the yard. He did not see the accident, but he heard the libelant make an exclamation, looked up, saw the blood on his forehead, hastened to him and tendered a clean rag, for obvious use. A statement made by Spencer, which is attached to his deposition dated January 14, 1933, places the chief mate forward in the eyes of the ship at the time of the libelant's injury.

It would seem likely that this was the fact; otherwise, if the chief mate had been grasping the bar at the time the accident happened, he would have been closer to the

libelant than Spencer, and the more likely to have tendered something to staunch the flood of blood than Spencer.

The remaining seaman was Hopper, who was acting as boatswain and who testified that his particular work in getting up the anchor consisted in locking the gears in the locking device, and running the windlass; that he was on the forward part of the windlass when he locked the gears, then went aft of the windlass to handle the throttle, where he stood until he had the anchor up. He said: "These two seamen (Spencer and libelant) who were on the forecastle head were standing by and they were tightening this compressor wheel," and that the chief officer was standing on the forward port side of the windlass. He said he did not see the accident, because at the moment it happened he was looking aft toward the tugboat.

His testimony incidentally is to the effect that he handled the port compressor wheel and used the bar while the ship was making her mooring at the yard, and that it fitted fairly well, and that there was no trouble with it.

■ It is impossible to conclude from an examination of the testimony that the libelant has demonstrated that the chief officer was using the bar in question and called upon him to assist in that operation.

It is equally impossible to conclude whether or not the chief officer gave an order to the libelant to use the bar for tightening the brake band; but, if he did, it is clear that this was such a duty as an able-bodied seaman ought to be able to perform without injury to himself, and the libelant testified that such was his rating.

There can be no doubt that, during the interval which has elapsed since the happening, the libelant has suffered from a serious mental disturbance, and this of course requires that his testimony should be corroborated as to what took place, for his memory seemingly cannot be relied upon.

The libelant was discharged from the Marine Hospital (to which he was sent promptly by the Master of the Davenport) on about the 11th of June, 1932, and instructed to stay in bed for a week and use an ice-pack on his head. He joined the steamship Ogontz in New Orleans on June 25, 1932, and was paid off at that port on September 7th of the same year, after making a trip to Spain and Portugal. On that discharge, he applied for a hospital pass, and was given one, and later received extended hospitalization; at the trial, he testified that he had been granted parole from the Brooklyn State Hospital where he had received treatment during the past year.

■ Upon the whole case, it is impossible to say that the libelant has sustained his burden of proof, and consequently the libel must be dismissed with costs.

Settle order on notice.

If findings are desired, they may be settled at the same time.